UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| AURICE BARLOW, | : |
| | : CIVIL ACTION NO. |
| Plaintiff | : 300 CV 1983 (WWE) |
| v. | : |
| | : |
| STATE OF CONNECTICUT | : |
| DEPARTMENT OF PUBLIC HEALTH | : |
| and ELIZABETH WEINSTEIN | : |
| | |
| Defendants | : November 26, 2003 |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S EXHIBITS AND PORTIONS OF HER RULE 56 STATEMENT**

I.  **INTRODUCTION**

On August 22, 2003, the defendants, the State of Connecticut Department of Public Health (the "DPH") and Beth Weinstein ("Weinstein") moved for summary judgment on the plaintiff Aurice Barlow's ("Barlow") Complaint. Barlow responded on October 22, 2003 by submitting her Rule 56 Statement; a Memorandum of Law and 50 Exhibits. This motion seeks to strike several of Barlow's exhibits because they are hearsay, incomplete and fail to meet minimal standards of trustworthiness. The defendants also seek to strike the multitude of allegations in Barlow's Rule 56 Statement that contain no citation to admissible evidence and instead assert a legal conclusion.

## II. <u>STANDARD</u>

Pursuant to Fed. R. Civ. P. 56(e), "when a Motion for Summary Judgment is properly made … an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided for under this rule, must set forth specific facts showing that there is a genuine issue for trial." As the Second Circuit has repeatedly recognized, under Fed. R. Civ. P. 56(e), "only admissible evidence may be used to resist a motion for summary judgment…." <u>Rohman v. New York City Transit Authority</u>, 215 F.3d 208, 218 n.6 (2nd Cir. 2000); <u>see also</u> <u>Kader v. Paper Software, Inc.</u>, 111 F.3d 337, 342-343 (2nd Cir. 1997) (non-moving party must come forward with admissible evidence demonstrating genuine issue of material fact in order to overcome summary judgment); <u>Rashkin v. The Wyatt Company</u>, 125 F.3d 55, 66 (2nd Cir. 1997) (in opposing summary judgment, plaintiff can rely only upon admissible evidence).

Pursuant to Fed. R. Civ. P. 56(e), "…affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein…" <u>See</u> also <u>U.S. Small Business Administration v. CitiBank, N.A.</u>, 1997 U.S. Dist. Lexis 1080 (S.D.N.Y. 1997) ("[b]ecause plaintiff has provided the Court no way of determining which portions of the affidavit are based on personal knowledge, the Court has no choice but to strike all of the statements."); and (<u>Bruchman v. Standard Chartered Bank</u>), 997 F. Supp. 481, 488, (S.D.N.Y. 1997). ([T]he Court will not speculate how [plaintiff] might have had personal knowledge of the issues he

discussed because under Rule 56(e) the affiant must demonstrate affirmatively personal knowledge.").

"The principles governing the admissibility of evidence do not change on a motion for summary judgment." Rashkin, at 66. "Because the purpose of summary judgment is to weed out cases in which 'there is no genuine issue as to any material fact and … it is appropriate for district courts to decide questions on the admissibility of evidence on summary judgment." Id.

"A motion to strike is the correct vehicle to challenge materials submitted in connection with a summary judgment motion." Newport Electronics v. Newport Corporation, 157 F.Supp.2d 202, 208 (D.Conn. 2001). "A party can make a motion to strike affidavits if they contain inadmissible hearsay or are not made on the basis of personal knowledge." Id. (citing Hollander v. American Cyanamid Co., 999 F.Supp. 252, 255-56. (D.Conn. 1998)).

"A motion to strike is also appropriate if depositions contain testimony that contains hearsay, speculation or conclusory statements." Hollander, supra at 255-266. "A motion to strike can also be used to challenge documentary evidence which has not been properly authenticated." Deydo v. Baker Engineering New York, Inc., 1998 U.S. Dist. LEXIS 132, 1998 WL 9376 at *4 (S.D.N.Y. 1998) ("A motion to strike will also be granted when it challenges documentary evidence that was submitted in support of or in opposition to a summary judgment motion, but which has not been properly authenticated … It is irrelevant that the documents may be in the future properly admitted at trial through a witness"). Finally, a motion to strike should be granted if it challenges an affidavit containing conclusory opinions

that are not helpful to the Court. United States Small Business Adm., supra at *6, citing Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (3d Cir. 1986) (holding that district court erred in declining to strike conclusory statement).

### III. ARGUMENT

#### A. THE COURT SHOULD STRIKE EXHIBITS 1, 6, 8, 10, 12, 16, 30, 39, 41, 45, 46, 49 and 50 BECAUSE THEY ARE HEARSAY AND UNRELIABLE AS A MATTER OF LAW

Barlow has produced numerous exhibits that would be inadmissible under the Rules of Evidence. These exhibits are hearsay, have no foundation and they fail to meet minimal requirements of reliability.

##### 1. The Court Should Strike the Unreliable Report of the CHRO's Investigation of Barlow's Complaint. (Exhibit 8)

A federal court has the discretion to exclude an agency's Reasonable Cause finding and any evidence underlying that finding. See EEOC v. Regency Architectural Metals Corp., 896 F.Supp. 260, 263 (D.Conn. 1995), aff'd, 1997 U.S. App. LEXIS 9570 (2nd Cir. 1997). The general rule is that the admissibility of EEOC reasonable cause determinations is within the discretion of the trial court, depending upon the probative value of the information, the inability of defendants to cross-examine the report, and the hearsay it may contain. Id. In addition, Federal Rule of Evidence 803(8)(C) authorizes the Court to preclude the "factual findings resulting from an investigation made pursuant to authority granted by law," if "the sources of information or other circumstances indicate a lack of trustworthiness." The Court should

4

strike Duncan's Reasonable Cause finding because it was based on fundamentally unreliable hearsay. It was also issued after an unquestionably faulty and one-sided investigation.

    i.    <u>Duncan's Report was Not a Final Determination of Barlow's Complaint.</u>

First and foremost, Duncan's Report cannot by any stretch of the imagination be deemed a final decision that found the DPH had discriminated against Barlow. Unlike the decision rendered by the Arbitrator who presided over Barlow's termination, Duncan's Report was based on a snapshot of the evidence relating to this case. It was not rendered after a complete and thorough evidentiary hearing. The Report is, at most, a finding that further investigation *could lead* to a finding of a discriminatory practice. <u>See</u> <u>Keene v. Hartford Hospital</u>, 208 F. Supp. 2d 238 (D. Conn. 2002). <u>See</u> <u>also</u> General Statutes § 46a-94. Accordingly, the Court should not look upon this Report as an evidentiary finding. In fact, if the Court digs beneath the surface of the Report, it becomes obvious that Duncan' report relies upon hearsay, misconstrues evidence and fails to understand fundamental principles of discrimination law.

    ii.    <u>Yvonne Duncan's Report is based upon unreliable hearsay.</u>

As an initial matter, Duncan's Report contains a multitude of statements that constitute inadmissible hearsay. <u>Lewis v. Velez</u>, 149 F.R.D. 474, 487 (S.D.N.Y. 1993); <u>Eng v. Scully</u>, 146 F.R.D. 74, 79 (S.D.N.Y. 1993). Rule 803(8)(C) was not meant to circumvent rules of evidence regarding hearsay. <u>Id.</u> at 80. Thus, unless the interviewee's purported statements, observations and perceptions would be independently admissible under the Federal Rules of

5

Evidence, they are not admissible when contained in an investigative report. Id. Significant portions of the Report consist of hearsay statements; and the perceptions of temporary employees who worked with Barlow, some of whom were not even at the DPH during the events underlying the Complaint.

Duncan's Report relied upon substantial hearsay in the form of statements from temporary employees who appear to have been Barlow's friends. (See Barlow's Exhibit 8, p. 4, 7, 10, 11, 13, 14). There is no indication in Duncan's Report that she actually interviewed these witnesses or that they were ever subjected to cross-examination. Instead, Duncan accepted their purported statements that Barlow gave to her. Duncan's Report credited these statements over the witnesses from the DPH who gave live testimony.

Duncan's reliance on substantial hearsay in this case is particularly egregious because it came from patently unreliable sources who admittedly had no first-hand knowledge of the events underlying her termination.[1] For example, Duncan relied on double hearsay statements from Pat Checko, who stated *she heard from discussions* that Barlow had been promised a PPT position but did not receive it. (Barlow's Exhibit 8, p. 4). Duncan accepted this hearsay to find that the DPH had in fact promised Barlow a promotion but discriminatorily revoked it.

Duncan also credited the statements of temporary workers at the DPH *who left two years before Barlow was terminated.* These individuals gave unsupported speculation such as

---

[1] The defendants have moved also to strike the hearsay statements submitted by Barlow's friends.

they "thought" people were out to get Barlow. Id. at 10. By the plain text of their statements, Barlow's friends had no personal knowledge of the circumstances under which she was terminated. Nevertheless, Duncan used these statements to condemn the DPH.

Moreover, Duncan actually relied on an anonymous phone call that was reported to her by a witness (Lew Brown) during an ex-parte contact. (Id., p. 7). Supposedly, Mr. Brown called Duncan and told her that he received an **anonymous** phone call from some unidentified person who told him that Barlow was "crazy." Duncan used this double hearsay to find the DPH had a bias against Barlow. (Id.).

The acceptance of this hearsay is sufficient to render Duncan's report untrustworthy as a matter of law. However, the manner in which Duncan conducted the investigation and the unsupported conclusions that she reached should preclude this court from giving it any consideration.

  iii. Duncan Completed a Substandard and Pre-determined Investigation.

In striking an agency's finding, courts have also relied on several distinct factors when determining whether a report is sufficiently trustworthy for admission under Rule 803(8)(C). These factors include the special skill or experience of the report's author; the procedural safeguards invoked in any hearing held in conjunction with the investigation; the investigator's impartiality; and the finality of the findings in question. See e.g., Advisory Committee Notes to Rule 803(8)(C); Gentile v. County of Suffolk, 129 F.R.D. 435, 450-458 (E.D.N.Y. 1990),

7

SHIPMAN & GOODWIN LLP • COUNSELORS AT LAW
ONE AMERICAN ROW • HARTFORD, CONNECTICUT 06103-2819 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

aff'd, 926 F.2d (2nd Cir. 1991); City of New York v. Pullman Inc., 662 F.2d. 910, 914 (2nd Cir. 1981); Lewis v. Velez, 149 F.R.D. at 487-89.   Duncan's report fails to satisfy these rigorous standards.  Not only did she base her conclusions upon unreliable hearsay, her investigation openly accepted Barlow's evidence yet demonstrated a prejudgment of the DPH's witnesses.  Moreover, Duncan's report made conclusions that were not supported by one shred of factual support.

While crediting the hearsay statements of temporary workers who spoke generally to Barlow's character, Duncan *prejudged and discredited* the statements of seven (7) permanent employees who were actual victims of Barlow's explosive conduct.  As set forth in the defendants' summary judgment motion, Barlow said "fuck you" to Christine Parker; swore at Nancy Berger; and disrupted others such as Cathy Cobb and Dorine Testori.  Duncan never interviewed these witnesses.  Instead, she pre-judged their testimony, concluding that:

> The Complainant's difficulties were occurring with those persons who were towing the line marked out by Weinstein – McLendon, Santoro, Testori, Parker, Cobb, Berger and Melchreit.
> Id. at 14.

The basis for Duncan's conclusion that these employees were "towing the line" for Weinstein is unknown.  As Duncan acknowledged, Parker, Cobb, Berger and Melchreit *did not even report to Weinstein*.  Berger was in fact a manager in a different division with no motivation to follow any of Weinstein's directives.  These *facts* did not seem to matter to Duncan.  She ignored the fact that these employees practically begged Weinstein to control

Barlow's behavior. Instead, without any *evidence,* and without listening to their stories of Barlow's misconduct, Duncan concluded that these 7 employees were lying.

Not only did Duncan pre-judge the witness's statements, she strongly resisted hearing their testimony when the DPH asked to present them as witnesses. Although she ultimately relented and allowed the DPH to present some witnesses, it is clear that she pre-judged them as being unworthy of belief. When the DPH asked to present several witnesses at Duncan's fact-finding investigation, Duncan stated that:

> With regard to the proposed list of witnesses, I fail to see the relevance of testimony from Dr. Melchreit, Mr. Carson and Ms. Carr since they are not in a position to speak to the specifics of [Barlow's] work performance which is the alleged reason for the discharge action.(See Attached Exhibit 1).

Not only did Duncan prejudge their testimony, her reasons for doing so were erroneous. Duncan concluded that Barlow was terminated for poor work performance. However, this was only one of the reasons for her termination. The primary reason was her inappropriate behavior. Mr. Carson and Ms. Carr directly witnessed some of these events and Tom Carson was asked by Barlow's co-workers to intervene. Morevoer, Dr. Melchreit had in fact supervised Barlow in 1998 before she was terminated. These predetermined judgments by Duncan clearly made the findings in her Report a foregone conclusion before she even heard the DPH's witnesses.

According to Duncan, full-time employees who worked side-by-side with Barlow were unworthy of belief, even though they were direct witnesses to her misconduct. However,

9

**SHIPMAN & GOODWIN** LLP • *COUNSELORS AT LAW*
ONE AMERICAN ROW • HARTFORD, CONNECTICUT 06103-2819 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

temporary workers who were apparent friends of Barlow carried the day, even though they left the DPH long before the events underlying Barlow's complaint.[2]

      iv.    <u>Duncan exhibited an unquestionable lack of skill by misconstruing substantial evidence and fundamentally misunderstanding Title VII discrimination law.</u>

Duncan heard devastating testimony from Tom Carson, the DPH's Principal Personnel Officer, who stated that Barlow's co-workers asked to meet with him because they had endured enough of Barlow's loud and disruptive misconduct. <u>Id</u>. at p. 7. (<u>See</u> <u>also</u> Affidavit of Tom Carson). These employees had grown so tired of Barlow's behavior that they reached out to the Human Resources' highest level manager for relief. However, Duncan twisted Mr. Carson's testimony. Again, without ever interviewing these co-workers who had to endure Barlow's behavior, Duncan turned their complaints into evidence that people regarded Barlow as having a disability. <u>Id</u>.

Duncan also performed a comparison of Barlow's performance evaluations before and after 1996, the year that Barlow filed her CHRO Complaint. The purpose of Duncan's comparison was to determine whether there was any significant change in Barlow's reviews after she complained. <u>Id</u>. at 12-13. Without any explanation, Duncan <u>*ignored*</u> the host of criticisms that permeated Barlow's pre-1996 reviews. For example, Barlow's 1988 review stated that her behavior, which included swearing at people, stood in her path of getting a PPT

---

[2] Not only is Duncan's assessment illogical, it squarely conflicts with Barlow's later testimony in which she stated that several of these individuals had no reason to lie about her. (Barlow, p. 235-238).

position. (Defendants' Exhibit 5). Duncan ignored this comment. Barlow's 1993 and 1994 reviews stated that her grammar was poor and that Barlow's face-to-face confrontational behavior needed to end. Id. Duncan looked the other way. Instead, she found that the DPH never addressed Barlow's behavior until after 1996, which is simply untrue. (Plaintiff's Exhibit 8, pp. 13-14).[3]

Duncan also misunderstood or intentionally disregarded significant evidence. For example, Duncan found that Barlow's job duties had been taken away from her because she had filed a complaint with the CHRO on August 6, 1996. However, Barlow has testified that those duties had been removed before she filed that Complaint. Id.

Duncan further misconstrued other evidence. She found that Barlow was terminated for having (1) filed a complaint with the Attorney General's Office on June 4, 1998; and (2) for having written to the Attorney General's office after she was terminated. (Id. at 8). As set forth in the defendant's response to Barlow's memorandum opposing summary judgment, (the "DPH's Response), Barlow has produced no evidence that these letters played any role in her termination. Nevertheless, Duncan used the letter dated June 4, 1998, which has never been produced, to find for Barlow. (Id.)

---

[3] Findings such as this one and others certainly create the impression that Duncan held a serious bias against the defendants. The manner in which she twisted the DPH's evidence to favor Barlow makes this clear. For example, several employees complained about a heated altercation that Barlow had with Clinton Roberts in 1998. (Defendants' exhibit 37). Duncan characterized this as a "possibly boisterous yet friendly exchange" that resulted in discipline. Duncan even went so far as to accuse the DPH staff of lying. (Plaintiff's exhibit 8, pp. 10-15);

Finally, Duncan unquestionably misunderstood the law that applies to Title VII retaliation cases. As the defendants pointed out in their Response, retaliation claims only protect individuals who complain about conduct protected by Title VII. See Cruz v Coach Stores, 202 F.3d 560, 566 (2d. Cir. 2000). Nevertheless, Duncan found Barlow engaged in "protected activity" when she: (1) asked for information concerning a "rumor" that a PPT position was slated for Dorine Testori; (2) wrote a letter that complained about her union representation on July 10, 1997; (3) wrote a letter complaining that the DPH had no concern for her and her child on January 26, 1998. Id. at 7-9. Interestingly, Barlow's letter dated July 10, 1997 regarding her union representation was not directed at the defendants *at all*. It was addressed to the failure of her union to adequately pursue a grievance. Again, Duncan either ignored this fact or intentionally disregarded it to find that *the defendants* retaliated against her when she was in fact *complaining about her union.*

Hence, not only did Duncan rely upon double hearsay and misconstrue evidence, she did not even understand the law that she was supposed to apply. If ever a case existed where the CHRO conducted a faulty investigation, this was it. Duncan's misunderstanding of fundamental principals of Title VII make her report patently unreliable.

SHIPMAN & GOODWIN LLP • COUNSELORS AT LAW
ONE AMERICAN ROW • HARTFORD, CONNECTICUT 06103-2819 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

2. **The Court Should Strike the Purported Doctor's Report Concerning Barlow's Hearing. (Exhibit 6B)**

The Court should strike Barlow's Exhibit 6B, which purports to be a report from a Dr. Hameroff relating to Barlow's hearing. This report is not verified in any way and is unquestionably hearsay. Moreover, it is not relevant to these proceedings. Barlow has never alleged that she was discriminated against on the basis of any alleged hearing deficiency and the Court should not now entertain this belated claim.

Even if this report satisfied the Rules of Evidence for admissibility, Barlow has submitted nothing from Dr. Hameroff or any other expert that interprets the report. Barlow claims that she had a hearing deficiency. However, that assertion cannot be derived solely from the face of Dr. Hameroff's report. In fact, Dr. Hameroff's states that Barlow's exam reported results "within normal range." Id. If Barlow contends this report says something more, neither she nor her lawyer can make that interpretation. Instead, it requires expert testimony. Barlow has not disclosed any type of expert in this regard and the time to do so has long passed. The Court should therefore strike this report.

3. **The Court Should Strike the Statements Purportedly Submitted by temporary co-workers that Attest to Her Character. (Exhibits 41, 50).**

Barlow has produced several unsworn statements from temporary employees who were not working for the DPH during the two years preceding her termination. (See Exhibits 41, 50). These statements are unquestionably hearsay and have not even the slightest indicia of reliability. In fact, one of these statements appears to be highly unreliable. (See Exhibit 41,

13

SHIPMAN & GOODWIN LLP • *COUNSELORS AT LAW*
ONE AMERICAN ROW • HARTFORD, CONNECTICUT 06103-2819 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

Statement of Melissa Acie). The purported statement of Melissa Acie is handwritten and several portions of the statement are not even visible on the document.

In addition, the statements have no relevance to this case because they were made by individuals who have no first-hand knowledge concerning the circumstances underlying Barlow's termination. It is well settled that the testimony of present or former employees, none of whom were involved in the decision-making process that affects the plaintiff's employment, is entirely irrelevant to plaintiff's claims of discrimination. Visser v. Packer Engineering, 924 F. 2d 655, 661 (7th Cir. 1991) (testimony from co-workers that plaintiff was terminated because of his age was inadmissible because it was not based on personal knowledge); Frieze v. Boatmens' Bank of Belton, 950 F.2d 538, 540 (8th Cir. 1991) (statements that the plaintiff was "too old... to become president of the bank" did not create an inference of discrimination because the statements were not made by persons who decided to terminate the plaintiff).[4] Numerous Courts have held that statements made by employees not involved in the decision-making process are not probative of an intent to discriminate by the decision-maker. Khachikian v. BASF Corp., 1993 U.S. Dist. LEXIS 16053, *35, 64 FEP Cases (BNA) 1842, 1850-51 (N.D.N.Y., 1993); DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998).

---

[4] See also LaMontagne v. American Convenience Products, Inc., 750 F.2d 1405, 1412 (7th Cir. 1984) (the mere fact that an employee recommended the plaintiff be replaced by a younger worker does not infer discrimination when the ultimate decision to terminate the plaintiff was made by a separate individual with more decision-making authority); Krumwiede v. Mercer County Ambulance Service, 116 F.3d 361, 363 (8th Cir. 1997) (comments by co-workers that the plaintiff was an old "granny" were irrelevant because they were not involved in decision-making process.)

The Courts refusing to admit this testimony have held that co-workers' opinions amount to mere speculation since they have no personal knowledge of the decision-maker's intent. For example, in Visser, the Court ruled:

> "The affiants do not report admissions by [the decision-maker] about his motives in firing [the plaintiff]. They do not report primary facts from which a reasonable person in their position would infer that one of the [decision-maker's] motives was to deprive [the plaintiff] of his pension. They construct a psychological model of [the decision-maker] and deduce from it that he *must* have wanted to do [the plaintiff] out of a pension. This is the kind of argumentation one expects in a closing argument. It is doubtful that a psychiatrist or psychologist would be allowed to offer it as expert testimony – it comes awfully close to arguing bad conduct from bad character contrary to Fed. R. Evid.404(a). It certainly exceeds the competency of a lay witness. Id.
>
> *Discrimination law would be unmanageable if disgruntled employees – the friends of the plaintiff and often people in the same legal position of the plaintiff – could defeat summary judgment by affidavits speculating about the defendant's motives...* The evidence here is speculation about the defendant's motives in dealing with the witnesses but not with the plaintiff. the affiants are self appointed biased tribunal to sit in judgment of the [decision-maker's] motives. Id. (emphasis added).

The plain text of these statements unquestionably illustrate their inadmissibility. For example, Melissa Acie has no first hand knowledge regarding the defendants' motives. In fact, she readily states that "for reasons <u>unbeknownst</u> to me, [Barlow] has been subjected to tyrannical treatment." Moreover, Acie's statement provides no <u>facts</u>; it is instead a run-on sentence about her personal feelings towards Barlow.

The statement of Stephanie Smith fares no better. Smith states that whether the treatment of Barlow is intentional or not *"she cannot say."* (Barlow's Exhibit 41).

15

SHIPMAN & GOODWIN LLP • *COUNSELORS AT LAW*
ONE AMERICAN ROW • HARTFORD, CONNECTICUT 06103-2819 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385