UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| AURICE BARLOW, | : |
| | :     CIVIL ACTION NO. |
|     Plaintiff | :     300 CV 1983 (WWE) |
| v. | : |
| | : |
| STATE OF CONNECTICUT | : |
| DEPARTMENT OF PUBLIC HEALTH | : |
| and BETH WEINSTEIN | : |
| | |
|     Defendants | :     November 26, 2003 |

### DEFENDANTS' REPLY MEMORANDUM OF LAW

**I.  INTRODUCTION**

The defendants submit this response to Aurice Barlow's ("Barlow") opposition to their motion for summary judgment. (Referred to herein as Barlow's "Reply").

There are three fundamental reasons why Barlow's Reply fails to defeat summary judgment. First, to support her claims for retaliation under Title VII and General Statutes § 31-51q, Barlow now claims that she was fired for having written four letters in 1998. However, conspicuously absent from Barlow's Reply is any evidence that the defendants ever knew about these letters or that they had anything to do with her termination.[1]

---

[1] Barlow's Complaint did not allege that she was terminated for this protected activity.

Second, Barlow frequently cites inadmissible evidence, makes unsupported assertions and misstates the dates that events occurred.[2] In several instances, Barlow claims that she was retaliated against, but her alleged "protected activity" actually occurred <u>after</u> she received the discipline that she complains about. Barlow in fact claims she was terminated for writing a letter to the Attorney General's Office, even though she wrote the letter <u>after</u> she was fired.

Third, because Barlow has not responded to the defendants' motion for summary judgment on Count Three, the Court should not send that Count to a jury.

## II. ARGUMENT

### A. BARLOW'S REPLY FAILS TO SAVE HER CLAIM FOR RETALIATION UNDER TITLE VII OF THE HUMAN RIGHTS ACT (COUNT ONE)

Barlow seems to have changed her theory of liability. In addition to the "protected activity" that she alleged in her complaint, Barlow now claims she wrote four different letters 1998 that complained about the treatment she received at the DPH. However, Barlow has failed to demonstrate that the defendants knew about these letters or that they played any role in the decision to terminate her. Moreover, Barlow has tried to create an inference of discrimination by misstating the chronology of several events. Finally, Barlow's evidence of pretext amounts to a self-serving claim that all of the individuals who complained about her were lying. Not only does this contradict Barlow's testimony, Barlow's generalizations and speculation are not supported by admissible evidence.

#### 1. Barlow has introduced brand new claims of "protected activity" without any evidence that the defendants were aware of it.

Barlow's Complaint alleged that the DPH retaliated against her because she filed a Complaint with the CHRO on August 12, 1996. She claims that the DPH gave her unwarranted

---

[2] For example, Barlow misstates the day she was terminated, the dates in which she received a transfer and the date she filed a complaint with the Attorney General's Office. (<u>See</u> Reply, p. 13).

2

discipline and then terminated her more than two years later. However, there is more than a two-year gap between Barlow's ultimate termination and the "protected activity" that she has alleged. As the defendants pointed out, this long passage of time leaves no inference of discrimination.

Equally true is that there is was an eleven month period between July 1997 and June 1998 in which Barlow did not receive any written discipline for her behavior. Barlow was disciplined in July 1997 for saying "fuck you" to Christine Parker and then in June 1998 for boisterously disrupting a meeting held by the DPH's highest level manager. (See Defendants exhibits 25, 29). Thus, not only was Barlow not engaged in any "protected activity" for two years before she was fired, she was also not disciplined for a significant period as well. However, in June 1998, Barlow reverted to her prior behavior and the complaints about her began to flood the DPH. See Exhibits 30-36. In the end, Barlow would have this Court believe that although she filed a Complaint in 1996, the DPH waited over two years to terminate her.

Barlow does not address this utter lack in proximity. Nor can she distinguish the substantial authority that states this protracted passage of time removes all inferences of retaliation. Instead, Barlow now says that she was terminated not for the CHRO Complaint, but because she wrote four letters to various agencies in 1998. They included correspondence: (1) to the Attorney General's office on June 4 and November 8, 1998; (2) to the Governor's office on September 19, 1998 and; (3) to the Labor Department on January 26, 1998. (Reply, p. 13-14).

These new allegations are an obvious attempt to try and create proximity between what she claims was "protected activity" and her termination. As Barlow is aware, she must show that she (1) participated in a **protected activity *known to the defendant***; (2) that she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action. Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d. Cir.

3

1998). However, Barlow is woefully unable to demonstrate that the DPH ever knew that she wrote these letters. Moreover, Barlow's letter to the Labor Department was not "protected activity". Accordingly, notwithstanding these new allegations, Barlow cannot defeat summary judgment.

    a.    **<u>Barlow Wrote a Letter To The Attorney General's Office *After* She was Terminated.</u>**

Starting with the letter that Barlow claims was written closest to her termination, it is painfully obvious that her claim must fail. Barlow says she wrote to the Attorney General's office on November 8, 1998. This was <u>*three weeks after*</u> she was terminated. (See Barlow's Exhibit 13). It could not have possibly played any role in her termination. Barlow's argument to the contrary stems from one of her many misstatements of fact. Barlow claims that she was terminated on November 10, 1998. (Reply, p. 15). However, she was terminated on October 26, 1998. (Defendants' Exhibits 38, 39).[3] Thus, Barlow's first attempt to create proximity fails to save her Complaint. Barlow's remaining attempts fare no better.

    b.    **<u>There Exists No Proof of a Letter To The Attorney General's Office Dated June 4, 1998</u>**

Barlow claims that she wrote to the Attorney General's office on June 4, 1998. However, there is no evidence that any such letter exists. Barlow has never produced a copy and there is no other independent evidence that one exists. Even if there is a letter, Barlow has <u>no evidence</u> that

---

[3] This is but one example in which Barlow has misrepresented the dates that events occurred in order to create the appearance of retaliation. Barlow's Reply is filled with claims that she was retaliated against, even though the events she claims were retaliatory occurred <u>before</u> she engaged in the alleged protected activity. See eg. p. 13, of Barlow's Reply, in which she claims she was transferred to the lab on <u>8/8/97</u> for having filed an internal complaint on 8/19/97.

4

the defendants knew she wrote it or that they ever received a copy.[4]  Summary judgment should not be denied because of evidence that does not exist.

    c.    **<u>There is No Evidence That The Defendants Knew About Barlow's Letter To The Governor's Office Dated September 19, 1998.</u>**

Barlow asserts that she wrote a letter to "Mr. M. McKeever" on September 19, 1998. However, there is again no evidence that anyone at the DPH knew that Barlow had written this letter or what was said in it.  The letter bears no indication that it was provided to <u>anyone</u> at the DPH.

Although Barlow has produced evidence that shows she notified the DPH that she had contacted the Attorney General's office on September 16, 2003,  (<u>See</u> Barlow's Exhibit 12), the fatal flaw in Barlow's argument is readily apparent.  Barlow's termination occurred <u>after</u> she received three straight unsatisfactory appraisals, consistent with the Collective Bargaining Agreement.  The third evaluation was given to her on or about September 30, 1998 and rated her conduct for *then entire prior year.*  The events that resulted in Barlow receiving an unsatisfactory review in 1998 were based on events that occurred *before* she went to the Attorney General's Office.  Barlow's review stated:

> Aurice's attendance has been unsatisfactory…She received a written and verbal warning regarding excessive absenteeism on July 2, 1998…
>
> Aurices' ability to deal with people is unsatisfactory, as it was last year. She has continued to have problems during this rating period getting along with professional and clerical staff in the AIDS Programs and elsewhere in the department…On June 22, she disrupted the Human Resources office by demanding to talk to Tom Carson…(<u>See</u> Defendant's Exhibit 5).

---

[4] It is interesting to note that Barlow claims she wrote to the Attorney General's Office because she had "[heard] nothing on the status of her [1996] whistleblower complaint." (Reply, p. 2). This claim is nonsense. Barlow would have this Court believe that she was so interested in what had happened to the old office furniture that she failed to press the issue until <u>*two years later*</u>. However, in the meantime, she did nothing. Moreover, Barlow's letter contains nothing more than her own complaints about how she feels she was treated. There is not even the slightest reference to the state furniture. To characterize this letter as a genuine interest in her original complaint is to blatantly misstate its plain text.

5

Barlow's other behavior included an explosive argument with a co-worker on August 14, 1998 (Exhibits 32-33); and an argument with Nancy Berger on September 17, 1998. (Exhibit 35). Accordingly, Barlow's termination had nothing to do with her contact with the Attorney General's Office. Barlow's *speculation* that she was terminated for writing this letter fails to defeat summary judgment.

Moreover, Barlow's implication that she was specifically given a poor review after having contacted the Governor's Office is false. Barlow received her performance evaluation every year on the same date. (See Defendants' Exhibit 5). It was routinely given to her in September. Thus, any implication that the DPH chose to give her the review in September just because she contacted the Governor's Office is ludicrous.

### d. There is No Evidence That The Defendants Knew About Barlow's Letter To The Department of Labor Dated January 26, 1998

Barlow's letter to the Labor Department is the most attenuated to her termination. Again, however, there is no admissible evidence that the defendants knew she had written that letter. Even if they did, based on the documents produced by Barlow, the Labor Department actually found that Barlow had *no claim* based on what she alleged. (See Exhibit 1).

More important, however, is that Barlow's letter was not "protected activity". 42 U.S.C. § 2000e-3(a) provides:

> "[I]t shall be an unlawful employment practice for an employer to discriminate against any of his employees… because he has opposed any practice *made an unlawful employment practice by this subchapter.*"

Further, 42 U.S.C. § 2000e-2(a)(1) defines an "unlawful employment practice" as:

> "[t]he failure or refusal of an employer to hire or to discharge any individual or to otherwise discriminate against any individual…*because of such individual's race, color, religion, sex or national origin…*" (emphasis added).

The term "protected activity" refers <u>only</u> to action taken to oppose discrimination prohibited by 42 U.S.C. § 2000e. <u>Cruz v. Coach Stores, Inc.</u>, 202 F. 3d 560, 566 (2000). <u>Nicastro v. Runyon</u>, 60 F. Supp. 2d 181, 184 (S.D.N.Y. 1999). <u>See</u> also <u>Santucci v. Veneman</u>, 2002 WL 31255115, *4 (S.D.N.Y., Oct. 8, 2002). If the conduct has nothing to do with race, color, religion, sex or national origin, an action cannot be maintained under Title VII. <u>Santucci</u>, <u>supra</u> at *4 (plaintiff's claim that rotation of jobs was corrupt failed to implicate Title VII because it did not allege discrimination).[5]

Barlow's letter did not make any allegations racial, national origin or sex discrimination. Instead, it says the DPH withheld a check from her; that it violated the FMLA; and that it had "no concerns for her and [her] child's well being." (<u>See</u> Barlow's Exhibit 32.) Since Barlow's letter did not alleged discrimination, it cannot form the basis of a Title VII retaliation claim.

Finally, according to the documents that Barlow produced, the Labor Department never took any action at all against the DPH. In fact, the Labor Department found that based on what Barlow had written, the DPH had *done nothing wrong*. (<u>See</u> Attached Exhibit 1).

In the end, Barlow's attempt to find some "protected activity" based on her new claims is a losing battle. Moreover, the "protected activity" that Barlow pled in her Complaint; namely the 1996 CHRO complaint, has no proximity to her termination. As set forth below, Barlow's attempt to explain away this lack of proximity fails to defeat summary judgment.

### 2. **Barlow's attempt to create an inference of retaliation based on her 1996 CHRO Complaint fails to satisfy her rigorous burden of proof.**

Barlow has tried to convince this Court that the DPH began a pattern of retaliation after she filed her CHRO Complaint in 1996. Barlow recites 8 "adverse actions" that she claims were

---

[5] For cases stating that alleged "whistleblowing" is not protected activity, under Title VII, see <u>Goodman v. New York City OTB Corp.</u>, 1999 WL 269959, *10 (S.D.N.Y., May 4, 1999) and <u>Nicastro v. Runyon</u>, <u>supra</u> at 185.

7

"close in time" to her 1996 Complaint or some other protected activity. (Reply, pp. 13-14).[6] However, Barlow has seriously misstated the chronology of these events. Moreover, she visibly misunderstands the type of protected activity required under Title VII. Perhaps most important, however, is that Barlow has not explained the fact that she was disciplined for confrontational behavior before she filed the CHRO (and for that matter, the Whistleblower) Complaint. (See Defendants' Exhibit 8). If Barlow's claim is that she was disciplined *because of* her complaints, she has failed to adequately explain how it was that she was disciplined before she filed any of these complaints. The chronology of various events that Barlow relies on are discussed below:

    a.    <u>Barlow's internal complaint about religious proselytizing in 1991</u>

Barlow claims that she was terminated "close in time" to an internal complaint that she made *in 1991*. (Reply, p. 13). Barlow would have this court issue new law stating that the passage of seven years can establish an inference of retaliation. Barlow's argument defies logic and counters well-settled case law in the Second Circuit.[7]

    b.    <u>Barlow's Letter dated 8/21/96 regarding Dorine Testori</u>

Barlow claims that she wrote a letter on August 21, 1996 because she heard a "rumor" that Dorine Testori was slated for a PPT position that she wanted. She then asserts that her letter was followed by an unsatisfactory performance evaluation on October 1, 1996. However, Barlow's letter about Dorine Testori does not allege that she was being discriminated against on <u>any</u> basis. (Barlow's Exhibit 3H). Therefore, the letter was not "protected activity" and it cannot form the basis of a retaliation claim. <u>Nicastro</u>, 60 F. Supp. 2d at 184.

---

[6] These incidents include the four letters that she wrote in 1998 and the particular events set forth in this section.
[7] See eg <u>Parmlee v. State of Ct. Dept. Rev. Svc.</u>, 160 F. Supp. 2d 294, 304 (D. Conn. 2001) (HBF) (Interval of 17 months fails to provide a causal connection); <u>Kodengada v. IBM Corp.</u>, 2000 U.S. App. LEXIS 31322, *4 (2000) (5 month interval is too long to support a nexus); <u>Matos v. Bristol Board of Education</u>, 204 F. Supp. 2d 375, 383 (D. Conn. 2002) (AHN) (no evidence of a causal connection exists for action that occurred 11 months after filing of CHRO Complaint).

8

  c.  <u>Barlow's Complaint to the CHRO on August 12, 1996</u>

Barlow maintains that because she filed a Complaint with the CHRO on August 12, 1996, the DPH gave her an unsatisfactory review on October 1, 1996. However, the unsatisfactory review was based on Barlow's misconduct that occurred ***before*** she filed the CHRO Complaint. Barlow was disciplined for four (4) explosive events that occurred on April 3 and August 3, 1996.[8] Barlow's review was brought on by her <u>misconduct,</u> not her Complaint.

  d.  <u>Barlow's Internal discrimination grievance of 8/19/97 did not result in a retaliatory transfer to the lab.</u>

Barlow claims that after filing an internal grievance on August 19, 1997, she was transferred to the "Lab." (Reply, p. 14). Once again, Barlow has misstated the facts. Barlow was offered a transfer to the lab on August 8, 1997, *<u>11 days before</u>* the grievance. (Defendants' Exhibits 26 and 27). Moreover, Barlow has *acknowledged* that her transfer to the lab was *voluntary*, to see if she would enjoy working there. (Barlow's Rule 56 Statement). Accordingly, it is inexplicable that she now claims the transfer was retaliatory.[9]

The point of this analysis is that Barlow has no real claim that the defendants engaged in a pattern of retaliation because of her 1996 Complaint or any other "protected activity." Barlow has confused the dates that events occurred and misunderstands what is required to show that she engaged in "protected activity". Her retaliation claim has no substance. Barlow's 1996 Complaint had nothing to do with her termination.

---

[8] <u>See</u> Defendants' exhibit 5 which states: "Aurice received a letter of warning on April 18 and August [9]. She has been uncooperative with supervisors and other staff. This includes refusing to do work given to her by a staff member, disrupting a staff meeting, arguing with a department manager and exhibiting hostile behavior... In the last six months, Aurice has exhibited behaviors of concern, including lengthy telephone calls of a personal nature and frequent personal visits from other staff.

[9] The other 4 actions that Barlow claims were "protected activity" are the letters that she wrote in 1998. Since these letters have already been discussed in Section A1, *infra*, the defendants shall not revisit them here.

9

### 3. **Barlow has produced no admissible evidence of pretext**.

Barlow's evidence of pretext is largely based on her assertion that she received the above adverse actions "close in time" to her alleged protected activity. However, as also shown above, Barlow's "evidence" is based on her confusion over when events occurred and her fundamental misunderstanding of what conduct is need to establish a "protected activity."

Barlow also implies that the complaints from co-workers such as Cathy Cobb and Christine Parker were lies and "generated for no purpose other than to establish a pretextual reason to terminate her." (Reply, p. 13). However, Barlow's testimony refutes these claims; she testified that she had no evidence that her co-workers had a reason to lie about her. (Barlow, p.235-238). In sum, Barlow's evidence of pretext is unsupported speculation that fails to satisfy her burden of proof.

### B. BARLOW'S CLAIM UNDER GENERAL STATUTES §31-51q (COUNT <u>TWO</u>) REMAINS DEFICIENT AS A MATTER OF LAW

The defendants have pointed out the lack of proximity between Barlow's 1996 "whistleblower" complaint and her termination. Again, Barlow has not and cannot refute this fact. Instead, she now premises her claim on: (1) the alleged letter to the Attorney General's office dated June 4, 1998; and (2) her letter to the Governor's office dated September 19, 1998. (Reply, p. 17). As established above, Barlow has provided no evidence that these letters played any role in her termination.

Moreover, Barlow's letters do not involve a matter of public concern. See . Lewis v. Cohen, 165 F.3d 154, 161-62 (2d Cir. 1999). Instead they complain about treatment that *she* supposedly received. They assert that *she* complained about Ms. McLendon's alleged proselytizing; that *she* was allegedly harassed; that *she* was denied work; that *she* received unfair

treatment. Stated differently, the letters focus solely on Barlow. They do not implicate a public concern and cannot form the basis of a claim under 31-51q.

### C. BARLOW HAS FAILED TO RESPOND TO THE DEFENDANTS' MOTION TO DISMISS COUNT THREE

The defendants have demonstrated that Barlow's claims under 42 U.S.C. § 1983 were deficient as a matter of law. Among other things, Barlow failed to identify other "similarly situated" employees; Barlow was not perceived as being disabled from performing a wide range of jobs; and that Beth Weinstein is qualifiedly immune from liability. Barlow has not refuted or even responded to these sound reasons for granting summary judgment.

A plaintiff opposing summary judgment may not rest on their pleadings. See FRCP 56. If a party does not respond properly, summary judgment, if appropriate, shall be entered against her. Champion v. Artuz, 76 F.3d 483, 85 (2d. Cir. 1996). Pursuant to Local Rule 56, a party's "failure to submit a memorandum in opposition to a motion may be deemed sufficient cause to grant the motion…" Because Barlow has not responded, the Court should grant the defendants' motion for summary judgment on Count Three.

The defendants note that Barlow's Reply states that she was "identified in 1997 as having a hearing deficiency." (Reply, p. 3). Once again, Barlow never asserted this as a basis for disability discrimination in her Complaint. Because it is unclear whether Barlow now makes this claim, the defendants are once again forced to address another one of Barlow's new claims.

Barlow has failed to provide any *admissible* evidence that she has a hearing loss. Instead, she has produced a hearsay document, purportedly from a physician, that indicates her "Tympanometry is within normal range." Nothing in this document suggests that Barlow has a

11

hearing loss.[10] Moreover, nothing in the record even remotely suggests that any action was taken against Barlow *because* of any perception that she had a hearing loss. Barlow received discipline for among other things, swearing at co-workers and other disruptive behavior. Barlow's apparent claim that she engaged in this conduct or was so disciplined *because of* an alleged hearing loss is simply baseless.[11]

### E. BARLOW HAS REPEATEDLY MISSTATED THE FACTS AND RELIED UPON INADMISSIBLE EVIDENCE.

Barlow's Reply is riddled with unsupported factual allegations. When she does cite authority, it is often to evidence that is either inadmissible or that which simply fails to support what she says. Because these statements are so egregious, the defendants must address them.[12]

- "[Barlow] was clearly working outside of her class" (Reply, p. 3)

Barlow claims that she "worked outside of her class" to assist Ann McLendon. However, there is no evidence to support this claim. Barlow has never provided an affidavit from her union or anyone else to support this claim. Revealingly, she never filed a grievance to protest having worked "outside of her class". The Court should therefore disregard this bald assertion.

- "The areas of growth were by no means a deficiency". (Reply, p. 4)

Barlow characterizes the sharp criticisms on her pre-1996 evaluations as "proposed areas of growth" that were "by no means a deficiency." This is ludicrous. To assert that swearing at supervisors, losing her temper and using poor grammar were not "deficiencies" is untenable. It

---

[10] Barlow never identified an expert who will testify as to her alleged hearing loss. Neither Barlow nor her attorney qualify as experts to interpret or analyze this report. Any attempt by them to do so should be disregarded by the Court.

[11] Moreover, Barlow's claims of disability discrimination against the State and against Weinstein in her official capacity are barred by Univ. of Alabama v. Garrett, 531 U.S. 356 (2001).

[12] One source of "evidence" frequently cited by Barlow is the report issued by a CHRO Investigator named Yvonne Duncan. Duncan's report is so faulty and deficient that it is unreliable as a matter of law. The defendants have moved to strike Ms. Duncan's report and because they address that issue at length in their Motion to Strike, they will not repeat those arguments here.

12

also contradicts her 1988 evaluation, in which Ms. McLendon stated that Barlow's behavior was in fact a roadblock in her path to a PPT position.[13]

- "Barlow's co-supervisor could have and should have evaluated her in 1996."

Barlow has tried to draw a negative inference from the fact that Beth Weinstein issued plaintiff's 1996 evaluation, stating, that her co-supervisor "could have and should have" evaluated her. (Reply, p. 5)  Once again, Barlow's claim has no basis.  In fact, Barlow admitted that required her co-supervisor to complete her 1996 evaluation.

- "The [1996 Whistleblower Complaint] was never investigated properly."

Barlow claims that she went to the Attorney General's office in 1998 because her 1996 "whistleblower" complaint "was never investigated properly." (Reply, 5). However, Barlow was not involved in the investigation.  She was in no position to make this type of statement and the Court should disregard it.

- "Barlow further exposed [the 1996 whistleblower] complaint on Channel 30."

Barlow should not be allowed to mislead this Court into believing that she was interviewed by a Channel 30 reporter when she first filed her 1996 "whistleblower" complaint. (Reply, p. 8).  To the defendants' knowledge, Barlow's story never aired until *after* she was terminated.  Barlow could have clarified this matter by producing a transcript of the interview or an Affidavit from the reporter from Channel 30.  Barlow chose not to do so, instead leaving the implication that she interviewed with Channel 30 in 1996, when clearly she did not.

---

[13] In fact, Barlow's Reply makes an incomplete reference to the 1988 evaluation, Barlow focuses on McLendon's statement that Barlow might "be a good candidate for upward mobility." but ignores the next sentences which states that Barlow loses her temper, uses foul language, behaved inappropriately and yelled at supervisors.

13

- "Giving away furniture away to friends contravenes public policy...."

Barlow has tried to demonize Ms. McLendon's disposal of state furniture by stating she "gave it away to friends." (Reply, p. 17). Again, no evidence supports this claim. Barlow doesn't even to cite to any.

### F. THERE IS NO BASIS TO DISREGARD ARBITRATOR GROSSMAN'S DECISION THAT FOUND BARLOW WAS TERMINATED FOR JUST CAUSE

Barlow asks this Court to reject Arbitrator Grossman's decision because it is "on appeal." (Id. at 16). In fact, the Appellate Court recently overturned Grossman's decision. Notably, however, the Court did not disturb the factual or legal findings made by Grossman. (See Attached Exhibit 2).[14] Instead, the Court decided that because both parties had failed to timely grant Grossman's request for additional time issue his decision, the untimely filing of his decision justified its vacation.

However, the court left untouched Grossman's finding that Barlow was a loud and disruptive employee who was terminated for just cause. Thus, although the decision was vacated, the Second Circuit's holding in Collins v. New York City Transit Authority, 305 F.3d 113, 119 (2d. Cir. 2002), which states that an unfavorable arbitration decision creates a heightened burden for Title VII plaintiffs, should apply with full force.

---

[14] In their motion for summary judgment, the defendants incorrectly asserted that Barlow had failed to seek vacation of Grossman's Award. The defendants were unaware of the Union's Motion to Vacate the decision which was defended by the Attorney General's Office and about which had never been advised until the Appellate Court's decision.

IV.  **CONCLUSION**

For these reasons, the Court should grant summary judgment.

> Defendants,
> The Connecticut Department of Public Health
> and Beth Weinstein
>
> By _/s/ Stephen M. Sedor_
> Stephen M. Sedor
> Federal Bar No. ct 21117
> Gary S. Starr
> Federal Bar No. ct 06038
> Shipman & Goodwin LLP
> One American Row
> Hartford, CT  06103-2819
> Telephone (860) 251-5558
> Facsimile (860) 251-5500

### CERTIFICATION OF SERVICE

I hereby certify that a copy of the foregoing motion was mailed, postage prepaid, this 26th day November, 2003 to:

Cynthia R. Jennings, Esq.
The Barrister Law Group, LLC
211 State Street, 2nd floor
Bridgeport, CT  06604

> _/s/ Stephen M. Sedor_
> Stephen M. Sedor

358779 v.01